2020 IL App (1st) 163294-U

FIRST DISTRICT
SECOND DIVISION
July 28, 2020

No. 1-16-3294

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 13 CR 3179-02 |
| | ) | |
| DIEGO PENALOZA, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The evidence was sufficient to convict defendant of aggravated discharge of a firearm and aggravated unlawful use of a weapon; and trial court properly considered aggravating and mitigating factors at the sentencing hearing.

¶ 2     Following a bench trial, defendant Diego Penaloza (Diego) was convicted of aggravated discharge of a firearm under an accountability theory and aggravated unlawful use of a weapon (AUUW). Diego's convictions stem from an incident that occurred on January 9, 2013 after he and codefendants Jose Penaloza (Jose), Marco Penaloza (Marco), and Rogelio Marin (Rogelio) were involved in a police chase during which Jose discharged a firearm at the officers. Jose, Marco and Diego were tried simultaneously, with Jose opting for a jury trial. Rogelio pled guilty to the charge of unlawful use of a weapon by a felon prior to trial. Diego was found guilty and sentenced to

concurrent terms of 16 years imprisonment for aggravated discharge of a firearm and 3 years for AUUW. 720 ILCS 5/24-1.6(a)(1) (West 2012). For the reasons discussed herein, we affirm the convictions.

¶ 3                                                      Trial

¶ 4         On January 9, 2013, Sterling Edwards (Edwards) and his uncle were heading west on Belden Avenue, when a "tan gold-ish" SUV with "four Hispanic male[]" occupants passed his vehicle going east. The front passenger and the two men in the back of the SUV made "hand gestures" at Edwards, which he recognized as gang signs[1].

¶ 5         As Edwards turned left onto Long Avenue, he saw the SUV stop and two men jump out through his rearview mirror. One of the men came from the back of the vehicle and the other had braids and "came from around the side of the driver." The men were approximately 15 to 20 feet behind Edwards' car. The man who came from the back of the vehicle had a black object in his hands, which Edwards "assumed . . . was a weapon" because "he was aiming it toward [him]" as he tried to drive away. At trial, Edwards identified Diego as the man with the gun and Marco as the man with the braids. As Edwards sped off, Diego and Marco got back in the SUV and chased after him with "a lot of speed."

¶ 6         During the chase, the SUV crashed into another vehicle at North Avenue and Laramie and continued down Laramie. Edwards saw someone in the SUV flash a gun immediately before the collision. Once he saw that the police had stopped the SUV, he pulled over and told them about what had just happened with Diego and Marco.

¶ 7         Edwards admitted that he had prior convictions for aggravated driving under the influence, aggravated fleeing and eluding, and multiple drug offenses. He acknowledged not testifying that he saw the gun twice before the grand jury, but explained he was never asked that question. He

_____

[1] Although Edwards denied any personal gang involvement at trial, the Chicago Police Department (CPD) database showed an affiliation with the Four Corner Hustlers Gang.

-2-

was unable to recall whether he told Detective Zacharias about seeing the gun twice prior to the collision.

¶ 8       Jose Santiago testified that he was turning onto Laramie the evening of January 9, 2013 with his two children in the back seat, when a gold SUV ran a red light and struck his vehicle. Instead of stopping, the SUV sped off down Laramie. Shortly thereafter, Santiago observed an unmarked police car make a U-turn on Laramie to follow the SUV.

¶ 9       Officers Yi and Theodorides confirmed that they were on patrol in an unmarked squad car "in high gang activity areas" the evening of January 9, 2013. They observed a beige SUV collide with a smaller black vehicle at the intersection of North and Laramie. When the SUV failed to stop, they activated their emergency equipment and began chasing the vehicle.

¶ 10       The SUV ran a stop sign and a red light before turning left onto Hirsch Street. As the officers followed behind onto Hirsch, Officer Yi observed a "male Hispanic on the front passenger side stick his head out . . . look in [their] direction . . . [place] his right hand out with a large firearm and take one shot at [them]." The shooter had long hair and a tattoo on his right cheek. Officer Yi immediately called in "shots fired at the police" to the dispatcher. The SUV kept fleeing "turning northbound on Leamington . . . hopping the curb and ended up driving on the sidewalk next to [a] school." The vehicle continued northbound to the end of the block where it was stopped by another police vehicle between Hirsch and Le Moyne. The occupants of the SUV were immediately taken into custody.

¶ 11       Officer Yi identified Jose as the man "who pulled out a firearm and took a shot at [him] and [his] partner." A submachine gun and a loaded, detached magazine were recovered "at right about the point where [they] were shot at." Officer Theodorides also identified Jose as "the person he immediately [identified] as the shooter to the other officers on the scene." Officer Theodorides testified that the gun appeared to have jammed, because a round had been loaded backwards and "the gun would have depleted the magazine . . . all the way" if it had been functioning properly.

¶ 12    Officer Sergio Valdez testified that he was on patrol when "[a]n officer came over the radio requesting assistance. He had been shot at." When he arrived at the scene, Officer Valdez was directed to 5155 Hirsch Street because "Officer Yi had indicated that there was a weapon used in the crime." On the south side of Hirsch, Officer Valdez observed what "appeared to be a Mac-10" and a detached magazine on the ground. He noticed that the slide of the weapon was "locked to the rear and protruding [was] a brass casing." Officer Valdez secured the weapon until the evidence technician arrived.

¶ 13    Officer Jose De Leon was part of the tactical unit that responded to the scene after receiving "notice that police were shot at [or] near that location." Officer De Leon made an in court identification of Diego, not Jose, as the man he saw seated in the front passenger seat when he approached the vehicle; however, when shown a photograph of Jose later in his testimony, he clarified that Jose, not Diego, was the man he had pulled from the front passenger seat. He also recovered a glove from between Jose's legs and a plastic bag containing 11 live 9-millimeter rounds of ammunition from his jacket pocket.

¶ 14    Evidence technician Lisa Decker described the recovered gun as a "9-millimeter high capacity weapon" from which multiple rounds could be shot. There was a "jammed metal fragment or metal casing inside the weapon" and the top bullet in the magazine had been loaded backwards. Other than those in the magazine, no bullets were recovered at the scene. Finally, an Illinois State Police FOID certification established that Diego had never been issued a FOID card.

¶ 15    Diego's motion for a directed finding of not guilty was granted as to the attempt first degree murder charge and denied as to the charges of aggravated discharge of a firearm and AUUW. After the admission of two stipulations, the defense rested. Diego was found guilty of aggravated discharge of a firearm and AUUW. He was sentenced to 16 years of imprisonment on the charge of aggravated discharge of a firearm and 3 years of imprisonment on the charge of AUUW, the sentences to be served concurrently.

-4-

¶ 16                                        ANALYSIS

¶ 17                   Sufficiency of the Evidence – Aggravated Discharge

¶ 18        Diego argues that the State failed to prove his accountability for Jose's actions beyond a reasonable doubt. When faced with a challenge to the sufficiency of the evidence supporting a conviction, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. The reviewing court does not retry the defendant or substitute its judgment for the trier of fact's on matters of witness credibility, the resolution of conflicts in the evidence, and which inferences to draw from the evidence. *Id.* Instead, the reviewing court will draw all reasonable inferences in the State's favor and will reverse a conviction only if the evidence is "so improbable or unsatisfactory" that there remains a reasonable doubt as to the defendant's guilt. *Id.*

¶ 19        A defendant is guilty of aggravated discharge of a firearm if he, or a person for whom he is legally accountable, knowingly or intentionally discharges a firearm in the direction of another. 720 ILCS 5/24-1.2(a)(4) (West 2012). A defendant is legally accountable for the conduct of another when, with the intent to "promote or facilitate" the commission of an offense, he "solicits, aids, abets, agrees or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012).

¶ 20        Although mere presence is insufficient to establish accountability for the conduct of another, a defendant need not actively participate in the commission of the offense. *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). "One may aid and abet without actively participating in the overt act." *Id.* The State may prove defendant's intent to promote or facilitate an offense through evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 22    Diego first argues that the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he shared Jose's intent to shoot at Officers Yi and Theodorides. Initially, we note that the State did not present a "shared criminal intent" theory at trial; rather, the State argued the defendants shared a "common design" and were therefore accountable for Jose's actions. The record reflects that the trial court agreed, finding that defendants "were out there in the business of representing their gang through [the interaction with Mr. Edwards] . . . and even with the police as they attempted to flee the area" and were therefore "accountable for the acts that one another engaged in that night." Since we also agree that the evidence established a "common criminal design," as more fully discussed below, we need not address the parties' arguments regarding shared criminal intent.

¶ 23                                          *Common Design*

¶ 24    Relying on *People v. Estrada*, 243 Ill. App. 3d 177 (1993), Diego argues that "the evidence here does not show, even by inference, that [he] had advance knowledge of [] Jose's criminal plan or scheme or that he aided, abetted, or encouraged Jose to shoot at the officers." In *Estrada*, the defendant's murder conviction under a theory of accountability was reversed where the evidence established that he was brandishing a tire iron from outside the car at the time the codefendant fired a weapon from inside the car, killing the victim. *Id.* at 185. The court found that because the defendant had already exited the car with a tire iron before the shooting, "there was no evidence that he was aware that [his codefendant] intended to shoot" the victim. *Id.*

¶ 25    Subsequently, however, in *People v. Fernandez*, 2014 IL 115527, our supreme court clarified the distinction between shared intent and common design, holding that "where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses *any* criminal act done in furtherance of the planned and intended act." *Id.* at ¶ 21 (citing *People v. Kessler*, 57 Ill. 2d 493, 497 (1974)

(Emphasis added). The court specifically rejected the idea that a defendant must have knowledge of his codefendant's intent under a common design theory. *Id.* Where a defendant voluntarily attaches himself to a group that is bent on illegal acts and he has knowledge of the group's design, this supports an inference that the defendant shared the common purpose and will sustain the defendant's conviction for an offense committed by another member of the group. *Id.* at ¶ 13. In evaluating whether a defendant is legally accountable for the actions of another, the trier of fact may consider factors such as whether the defendant was present during the perpetration of the offense, whether he fled from the scene, whether he maintained a close affiliation with his companions after the commission of the crime, and whether he failed to report the crime. *Id.* at 17.

¶ 26 Here, even if Diego did not know that Jose intended to shoot at the officers, he is accountable for Jose's actions if they were committed in furtherance of the planned or intended actions that evening. *Id.* Diego's contention that he was "merely present" when Jose shot at the officers is unconvincing. The evidence shows that Diego voluntarily joined his codefendants in threatening Edwards with gang signs, aimed a gun at him, and willingly participated in the conduct that ensued. He remained in the SUV as it chased after Edwards, crashed into another vehicle, fled the scene of an accident, fled from the police, shot at the police, and continued to flee after the shooting. Viewing the evidence in the light most favorable to the State, it is reasonable to infer that Diego voluntarily participated in the crimes committed by the group and "maintained a close affiliation with his companions after the commission of the crimes." *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). Accordingly, the evidence was not "so improbable or unsatisfactory" that a reasonable doubt remains as to Diego's guilt under an accountability theory. *People v. Harris*, 2018 IL 121932, ¶ 26

¶ 27 <center>Sufficiency of the Evidence - AUUW</center>

¶ 28 To prove defendant guilty of aggravated unlawful use of a weapon, the State was required to establish that defendant knowingly "carrie[d] on or about his person or in any vehicle or

<center>-7-</center>

concealed on or about his or her person * * * any pistol, revolver, stun gun or taser or other firearm" and he had not been issued a currently valid firearm owner's identification card. See 720 ILCS 5/24-1.6(a)(1), (3)(C) (West 2012). Defendant asserts that the evidence was insufficient to prove him guilty of AUUW, because Edwards saw the offenders at night, in his rearview mirror, from 15-20 feet away and his testimony was inconsistent. We find defendant's arguments unavailing.

¶ 29    In a bench trial, the trial judge is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). A reviewing court will not reverse a conviction simply because the evidence is contradictory or because the defendant claims that a witness was not credible. *Id.* In finding the defendant guilty in this case, the trial judge expressly determined that "Sterling Edwards was a highly credible witness and "[his] testimony was highly probative in [the] court's view." The trial judge, who saw and heard all the witnesses, was in a much better position than we are to determine their credibility and the weight to be accorded their testimony. *Id.* at 229.

¶ 30    Defendant asserts that there were "several discrepancies between Edwards' trial testimony and his statements to investigating officers and the grand jury," relying primarily on Edwards' failure to mention that he saw the gun twice. However, Edwards explained that he was not asked whether he saw the gun a second time during his grand jury testimony. In addition, his testimony that Diego aimed a gun at him while he sat in his vehicle was consistent and unimpeached.

¶ 31    We also reject Diego's argument that the evidence was insufficient because the State failed to present physical evidence of the gun Diego allegedly possessed. If a witness' testimony is otherwise credible, the State is not required to present additional physical evidence that links defendant to the gun. *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 33. A criminal conviction can be based solely on circumstantial evidence (*People v. Brown*, 2013 IL 114196, ¶ 49) and unequivocal testimony that the defendant held a firearm constitutes circumstantial evidence

-8-

sufficient to show a defendant is armed. *People v. Clark*, 2015 IL App (3d) 140036, ¶ 20. Moreover, "in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* at ¶ 23 (citing *People v Campbell*, 146 Ill. 2d 363, 380 (1992)).

¶ 32        The trial court found Edwards to be a credible witness and accepted his unequivocal testimony that Diego exited the back of the SUV and aimed a weapon at him. Subsequently, officers recovered a black submachine gun from the scene of the shooting. Viewed in the light most favorable to the State, it is reasonable to infer that the weapon Diego aimed at Sterling Edwards was the same weapon subsequently recovered by police. We do not find that the evidence was so improbable or unsatisfactory that it created a reasonable doubt that Diego committed the offense of AUUW.

¶ 33        Finally, Diego asserts that the trial judge "misapprehended" Edwards' testimony, because "the court essentially stated that Edwards was not in a gang, when, in fact, a stipulation between the parties showed that he was a Four Corners Hustler." Diego relies on a statement made by the judge during Diego's sentencing hearing, indicating that he was "troubled by the confronting of these two African American individuals on the northwest side of the city of Chicago, which was predicated, in this court's view, on the presumption that because of their ethnicity, that they were somehow affiliated with a gang themselves."

¶ 34        Even assuming, *arguendo*, that the trial court's comments over a year later at the sentencing hearing were inaccurate, they do not vitiate its initial finding of guilt. See *People v. Burnette*, 325 Ill. App. 3d 792, 803 (2001). In *Vuk R.*, 2013 IL App (1st) 132506, ¶ 6, the trial judge found respondent guilty of aggravated battery involving great bodily harm and not guilty of aggravated battery on a public way, without making any findings of fact. Then, at the sentencing hearing, the judge stated that in "both the government's case and the defense case, every one of those witnesses

lied" and "it certainly did not occur the way any of these witnesses testified to." *Id.* Given these comments, we held that the State failed to meet its burden at trial. *Id.* at ¶ 7.

¶ 35    In finding Diego guilty, the trial judge made specific findings of fact and credibility and relied on his "strong recollection of the evidence that [he] heard at the trial" and "[his] observations of the witnesses." He ruled immediately after hearing Edwards' testimony and the stipulated CPD database evidence "at a time when the evidence was necessarily fresh in the court's mind." *Burnette*, 325 Ill. App. 3d at 803. Under these circumstances, "this is not an error of sufficient magnitude to merit vacating [Diego's] conviction." *Id.*

¶ 36                              Illinois State Police Certification

¶ 37    Diego also argues, for the first time on appeal, that the State violated his right to confrontation by introducing an Illinois State Police certification to show that he did not have a FOID card. The confrontation clause of the sixth amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. An Illinois State Police certification stating that defendant lacked a FOID card is a testimonial statement pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004); therefore, the confrontation clause is implicated. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 63; *People v. Diggins*, 2016 IL App (1st) 142088, ¶ 16. Since the admission of the Illinois State Police certificate does not involve disputed facts, our review is *de novo. Cox*, 2017 IL App (1st) 151536 ¶¶ 57-58 ("where the facts are undisputed and the declarant's statement and any comments about it are before us, we apply a *de novo* standard of review").

¶ 38    Having failed to object to admission of the certification at trial or in a posttrial motion, Diego urges us to consider the issue under the plain error doctrine or as an ineffective assistance of counsel claim. Under the plain error doctrine, a reviewing court may address a forfeited claim where "a clear or obvious error occurred" and either: (1) the evidence is so closely balanced that the error alone severely threatens to tip the scales of justice; or (2) the error is so serious that if

-10-

affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Hood*, 2016 IL 118581, ¶ 18. However, when a defendant procures, invites, or acquiesces to the admission of evidence, even though the evidence is improper, [he] cannot contest the admission on appeal. *People v. Bush*, 214 Ill. 2d 318 (2005). Because invited errors are not subject to plain error review, we first consider whether Diego invited the alleged error by failing to object to admission of the certification. *People v. Sanders*, 2012 Il App (1st) 102040-B, ¶ 30.

¶ 39        In *Cox*, we found no error in the admission of a similar Illinois State Police certification regarding a FOID card where the defense failed to object despite being "given multiple opportunities to do so by the court." *Cox*, 2017 IL App (1st) 151536, ¶ 26. We held that the defendant "invited the trial court to admit the certificate by affirmatively responding to the trial court's questions that it had no objection to its admission. *Id.* at ¶ 76. The *Cox* court specifically distinguished *People v. Diggins*, 2016 IL App (1st) 142088, on which Diego relies, because *Diggins* concerned evidence that was disputed. *Id.* at ¶¶ 80-83.

¶ 40        In this case, Diego acquiesced to the entry of the Illinois State Police certification and cannot now contend that the admission was error. Therefore, we need not consider whether plain error occurred. *Sander*s, 2012 IL App (1st) 102040, ¶ 30.

¶ 41        We similarly reject Diego's contention that his attorney was ineffective for failing to object to the admission of the Illinois State Police Certification. "The only way that defense counsel's decision not to object to the certification could *possibly* be ineffective assistance was if defendant actually had a FOID card and the certification was in error. Otherwise, counsel's decision . . . was a matter of trial strategy." (Emphasis in original.) *Cox* at ¶ 88. There is nothing in the record here to suggest that Diego possessed a valid FOID card or that the certification was in error. Counsel never argued either point at trial, arguing instead that Diego never possessed the gun. Under these circumstances, Diego has not overcome the strong presumption that counsel's failure to object was

sound trial strategy. See *People v. Manning*, 241 Ill. 2d 319, 327 (2011); see also *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 32 (concluding that trial counsel's decision not to object was an intentional strategy because testimony regarding the defendant's failure to possess a FOID card would only have emphasized his unlawful conduct). Accordingly, Diego's claim of ineffective assistance of counsel fails.

¶ 42                                     Sentencing

¶ 43        Diego next argues that his sentence of 16 years for aggravated discharge of a firearm is excessive. He concedes that he failed to preserve this issue for appeal by filing a post-sentencing motion, but seeks review under the plain error doctrine or as an ineffective assistance of counsel claim. In the sentencing context, plain error may be invoked if i) the evidence at the sentencing hearing was closely balanced, or ii) if the error was so egregious as to deprive defendant of a fair sentencing hearing. *People v. Rathbone*, 345 Ill. App. 3d 305, 311 (2003). The predicate to a discussion of plain error is the determination that an error occurred in the trial court. *People v. Walker*, 232 Ill.2d 113, 124-25 (2009) (initial step in plain error analysis is to determine whether error occurred at all); *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007) (without error there can be no plain error). This inquiry requires us to conduct a substantive review of the issue. *Walker*, 232 Ill. 2d at 125.

¶ 44        Diego's presentence investigation (PSI) indicated that he had a 2007 finding of delinquency for a robbery and a 2012 conviction for possession of a stolen motor vehicle (PSMV), for which he was sentenced to bootcamp. He subsequently violated bootcamp and was sentenced to three years IDOC. Diego admitted to joining the Latin Stylers street gang when he was 17 but stated that he terminated his affiliation with the gang in 2013. He was lawfully employed from 2008 to 2013, had no drug or alcohol problems, and came from a stable family.

¶ 45        In mitigation, the defense argued that Diego was 21 years old at the time of the incident and had no violence in his background. Counsel also argued that Diego was "merely a passenger

in a car in which one of his cousins or brothers threw a gun out of the window that discharged on impact . . . no one was injured . . . and there was no evidence that they were running around town with loaded guns."

¶ 46     Before imposing the sentence, the trial judge stated that he was "going to take the following things under consideration: The evidence that [he] heard at the trial for each of these individuals, the presentence investigation – which [he's] read in its full entirety – the evidence offered in aggravation, mitigation, the statutory factors in aggravation and mitigation, the financial impact of incarceration, and the arguments [he] just heard from the attorneys." Regarding Diego specifically, the judge stated that he was "taking into account all the arguments made by the attorneys, but it's important to note that Diego Penaloza has a prior felony conviction as well as some juvenile justice issues."

¶ 47     A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The trial court is in a superior position "to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Although a trial court must consider mitigating factors in making its decision, it has no obligation to recite each factor and its accorded weight. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, we presume a trial court properly considered all the relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 48     A reviewing court will not reweigh the aggravating and mitigating factors and substitute its judgment for that of the trial court just because it would weigh those factors differently. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. Where a sentence falls within the statutory range, we presume it is proper and will not alter it absent an abuse of discretion. *People v. Brown*, 2015 IL App (1st) 130048, ¶ 42 (quoting *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). An abuse of discretion

-13-

exists where the sentence imposed is at a great variance with the spirit and purpose of the law, or is manifestly disproportionate to the nature of the offense. *Id.*

¶ 49 The sentencing range for aggravated discharge of a firearm in the direction of a peace officer is 10 to 45 years. 720 ILCS 5/24-1.2(a)(3), (b). The 16-year sentence imposed in this case is within the statutory sentencing range and presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. This presumption cannot be overcome without affirmative evidence that the trial judge failed to consider factors in mitigation. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27 (citing *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010)).

¶ 50 Defendant essentially asks us to reweigh the sentencing factors and substitute our judgment for that of the trial court. This we cannot do. See *Busse*, 2016 IL App (1st) 142941, ¶ 20. Because the sentence is presumed to be proper and the record reflects that the trial court considered "the statutory factors in aggravation and mitigation," we find that the court did not abuse its discretion in sentencing defendant to 16 years' imprisonment. Having found that no sentencing error occurred, we decline to consider Diego's alternative argument that his counsel was ineffective for failing to present a post-sentencing motion.

¶ 51 Correcting the Mittimus

¶ 52 Finally, defendant contends, and the State agrees, that the mittimus should be corrected to reflect a 3-year sentence for AUUW rather than a 16-year sentence. Because defendant raises this issue for the first time on appeal, "we remand to the circuit court to allow [defendant] to file a motion" to correct the mittimus pursuant to Illinois Supreme Court Rule 472(e), Ill. S. Ct. R. 472(e) (eff. May 17, 2019). *People v. Scott*, 2019 IL App (1st) 163022, ¶ 26.

¶ 53 Conclusion

¶ 54 For the foregoing reasons, we affirm defendant's convictions for aggravated discharge of

-14-

a firearm and AUUW and remand to the trial court for further proceedings consistent with this order.

¶ 55    Affirmed and remanded.